1
2
3
4
5
6
7
8

UNITED STATES DISTRICT COURT

9

CENTRAL DISTRICT OF CALIFORNIA

10
11

KBS HOLDCO, LLC,

Case No. 2:22-cv-05750-FLA (GJSx)

12

Plaintiff,

**ORDER GRANTING IN PART AND**

13

v.

**DENYING IN PART THE CITY OF**
**WEST HOLLYWOOD'S MOTION**

14
15

CITY OF WEST HOLLYWOOD, *et al.*,

**TO DISMISS THE FIRST AMENDED**
**COMPLAINT [DKT. 52]**

Defendants.

16
17
18
19
20
21
22
23
24
25
26
27
28

**RULING**

Before the court is Defendant City of West Hollywood's (the "City") Motion to Dismiss (Dkt. 52, "Motion") the First Amended Complaint (Dkt. 36, "FAC").[1] Plaintiff KBS Holdco, LLC d/b/a Regency Outdoor Advertising ("Plaintiff" or "Regency") opposes the Motion.  Dkt. 53 ("Opp'n").  On July 5, 2023, the court took the Motion under submission, finding the matter appropriate for decision without oral argument.  Dkt. 70; *see also* Fed. R. Civ. P. 78(b); Local Rule 7-15.

For the reasons stated herein, the court GRANTS in part the Motion and DISMISSES the third, fourth, and fifth causes of action with 21 days' leave to amend. The motion is otherwise DENIED.

**BACKGROUND**

On April 1, 2019, the City passed, approved, and adopted Ordinance No. 19-1063 (the "Ordinance"), which amended sections of Title 19 of the West Hollywood Municipal Code (the "Zoning Code") and the City's existing Sunset Specific Plan regarding off-site signage in the Sunset Specific Plan Area (the "Sunset Strip").  Dkt. 52-4 ("Ordinance") at 1, § 2.  The amendments to the Sunset Specific Plan (the "Amended Billboard Plan") include "new standards and guidelines to regulate the distribution, size, location, and operation of new and modified billboards and tall walls," and design principles intended to "ensure high-quality signage projects that are creative, contextual for Sunset Boulevard, and sensitive to adjacent land uses."  *Id.* Under the Amended Billboard Plan, applications for new off-site signs must be "screened for design excellence in accordance with a process and procedures established by the City Manager, or designee" and granted concept awards, before applicants may apply for development agreements with the City.  *Id.* at 11.  According to Plaintiff, the City Manager or his or her designees created the Sunset Arts and

---

[1] The court cites documents by the page numbers added by the court's CM/ECF System, rather than any page numbers listed natively.

Advertising Program to conduct the screening process and delegated all discretion and decision-making authority to the Design Excellence Screening Committee (the "Screening Committee").  FAC ¶¶ 26–28.

On September 24, 2021, the City published a submission guide (the "Submission Guide") for the second round of submissions for the Sunset Arts and Advertising Program ("Round 2").  Dkt. 52-5 ("Submission Guide").  Regency and Defendant Orange Barrel Media, LLC ("Orange Barrel") were among the companies that submitted applications during Round 2.  FAC ¶ 39.  Defendant David Ehrlich ("Ehrlich") was a member of the Screening Committee.  *Id.*  Ultimately, both of Plaintiff's applications were denied.  *Id.* ¶ 52.  Plaintiff contends the screening process was arbitrary and based on subjective standards for which the City provided no real guidance, and that it gave the Screening Committee unbridled discretion in choosing which billboard operators were allowed to apply for and obtain new billboard sites on the Sunset Strip.  *Id.* ¶¶ 2, 29.

On April 12, 2023, Plaintiff filed the operative FAC, asserting five causes of action against the City for: (1) declaratory relief for violation of the First Amendment; (2) injunctive relief; (3) violation of procedural due process based on a sham application process; (4) violation of procedural due process for constructive debarment; and (5) declaratory relief for violation of procedural due process.  FAC ¶¶ 61–97.  Plaintiff also asserts six causes of action against Defendants Ehrlich and Orange Barrel which are not at issue on the subject Motion.  *Id.* ¶¶ 98–141.

## **REQUEST FOR JUDICIAL NOTICE**

The City requests the court take judicial notice of and/or find incorporated by reference: (1) provisions of the City of West Hollywood's Municipal Code; (2) the Sunset Specific Plan; (3) the Ordinance; (4) the Submission Guide; and (5) Plaintiff's Round 2 applications.  Dkt. 52-7.  Plaintiff does not oppose the request.

The court may take judicial notice of facts not subject to reasonable dispute because they are either: (1) generally known within the trial court's territorial

jurisdiction, or (2) capable of accurate and ready determination from sources whose accuracy cannot reasonably be questioned.  Fed. R. Evid. 201(b).  "Incorporation-by-reference is a judicially created doctrine that treats certain documents as though they are part of the complaint itself."  *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1002 (9th Cir. 2018).  A document may be deemed incorporated by reference "if the plaintiff refers extensively to the document or the document forms the basis of the plaintiff's claim."  *Id.* (quotation marks omitted).

Having reviewed and considered the request and finding good cause therefor, the court takes judicial notice of these documents and/or finds they are incorporated by reference into the FAC.

## DISCUSSION

### I.   Legal Standard

Under Fed. R. Civ. P. 12(b)(6) ("Rule 12(b)(6)"), a party may file a motion to dismiss a complaint for "failure to state a claim upon which relief can be granted."  The purpose of Rule 12(b)(6) is to enable defendants to challenge the legal sufficiency of the claims asserted in the complaint.  *Rutman Wine Co. v. E. & J. Gallo Winery*, 829 F.2d 729, 738 (9th Cir. 1987).  A district court properly dismisses a claim under Rule 12(b)(6) if the complaint fails to allege sufficient facts "to state a cognizable legal theory or fails to allege sufficient factual support for its legal theories."  *Caltex Plastics, Inc. v. Lockheed Martin Corp.*, 824 F.3d 1156, 1159 (9th Cir. 2016).

"To survive a motion to dismiss, a complaint must contain sufficient factual matter … to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  *Twombly*, 550 U.S. at 555 (citations and brackets omitted).  "Factual allegations must be enough to raise a right

to relief above the speculative level on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Id.* (citations and parentheticals omitted).  "Determining whether a complaint states a plausible claim for relief is 'a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.'" *Ebner v. Fresh, Inc.*, 838 F.3d 958, 963 (9th Cir. 2016) (quoting *Iqbal*, 556 U.S. at 679).

When evaluating a complaint under Rule 12(b)(6), the court "must accept all well-pleaded material facts as true and draw all reasonable inferences in favor of the plaintiff." *Caltex*, 824 F.3d at 1159.  Legal conclusions "are not entitled to the assumption of truth" and "must be supported by factual allegations." *Iqbal*, 556 U.S. at 679.  The court need not accept as true allegations that contradict matters properly subject to judicial notice or established by exhibits attached to the complaint. *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001), *amended on other grounds*, 275 F.3d 1187 (9th Cir. 2001).  "Nor is the court required to accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *Id.*  A court must normally convert a Rule 12(b)(6) motion into a motion for summary judgment under Fed. R. Civ. P. 56 if it considers evidence outside the pleadings.  *United States v. Ritchie*, 342 F.3d 903, 907–08 (9th Cir. 2003). "A court may, however, consider certain materials—documents attached to the complaint, documents incorporated by reference in the complaint, or matters of judicial notice—without converting the motion to dismiss into a motion for summary judgment." *Id.* at 908.

## II.    Analysis

### A.    The Amended Billboard Plan and Round 2 Submission Process

The Amended Billboard Plan requires all applications for new off-site signs to be "screened for design excellence" and "evaluated based on the specific design principles" of:

/ / /

- <u>Design Quality</u>: (a) Design Excellence, (b) Innovative Design, and (c) Context & Compatibility Design;

- <u>Adaptable & Sustainable Strategies</u>: (d) Adaptability and (e) Sustainable Practice; and

- <u>Lasting Value</u>: (f) Economic Development and (g) Community Benefits.

Ordinance at 8–9, 11.  Neither the Ordinance nor the Amended Billboard Plan identify the weight each "design principle" should receive in the evaluation.  "Qualifying submissions are granted a concept award, valid for a period of 2 years, [which make] the applicant eligible to apply for a development agreement."  *Id.* at 11.  Applicants are prohibited from erecting or installing new off-site signs absent a concept award and development agreement with the City.  *Id.*

Round 2 applications were reviewed and scored by the Screening Committee on ten "evaluative criteria" stated in the Submission Guide.  Submission Guide at 11.  Applications were required to receive an average weighted score of 225 out of 250 points to secure a concept award.  *Id.* at 9.  These criteria and their associated point values were:

1) "Is the design exceptional (see Section 2.1 'Design Quality' of the 2019 Billboard Policy)" – 50 points;

2) "Does the project create a unique opportunity for the display and experience of public art?" – 30 points;

3) "Does the project showcase a commitment and sensitivity to the importance of diversity in the architectural design and/or advertising industry?" – 30 points;

4) "Does the project create and sustain a positive land use outcome? (New development project, rehab of building, preserve an important building or use)" – 30 points;

5) "Does the project add value to the public realm, the experience of place, and the pedestrian experience along Sunset?" – 25 points;

6) "Does the project create valuable signage that reinforces Sunset as the premier destination for creative advertising?" – 25 points;

7) "Does the project create positive economic development outcomes on the Sunset Strip?" – 25 points;

8)   "Does the project align with the City of West Hollywood's ongoing and future initiatives toward sustainability and best green practices?" – 15 points;

9)   "Does the project build on the historic and cultural aspects of the Sunset Strip?" – 10 points; and

10)  "Is there a positive relationship between the proposed sign and existing or other proposed signage projects?" – 10 points.

*Id.* at 11.

The Submission Guide also included an "Evaluation Criteria Explanation Handout" with additional explanations for each criterion. *Id.* at 14–18. While the Submission Guide stated these "criteria and weighting (points) were formulated based on the policy's design principles adopted by the City Council" (*id.* at 3), it did not explain specifically how each of these criteria mapped or embodied the seven design principles.

As the number of concept awards available during Round 2 was limited, the Selection Committee granted concept awards only to those applications with the highest average score in each submission category, with tiebreakers favoring the project with the higher average score in "the Design Quality." *Id.* at 6, 8–9. The Submission Guide did not define the term "Design Quality" or explain whether it referred to the first criterion only (*see id.* at 11) or the design principles stated in the Amended Billboard Plan under this label: (a) Design Excellence, (b) Innovative Design, and (c) Context & Compatibility Design) (Ordinance at 8). According to the Submission Guide, "the [Selection Committee's] collective decision shall be the final decision and function as an appeal." Submission Guide at 8.

**B.    Plaintiff's First and Second Causes of Action for Violation of the First Amendment**

Plaintiff alleges the Amended Billboard Plan facially violates the First Amendment as an unconstitutional, content based prior restraint on commercial speech. FAC ¶ 63. The City contends the Amended Billboard Plan is a constitutional, content neutral time, place, and manner restriction because it "does not describe

speech by content, nor does it 'discriminate based on the topic discussed or the idea or message expressed.'" Mot. at 16–17. Based on the facts pleaded or judicially noticeable on the subject Motion, the court finds the Amended Billboard Plan and Round 2 screening process constitute an unconstitutional, content based regulation that delegates overly broad licensing discretion to the City Manager and members of the Screening Committee.

"A regulation of speech is facially content based under the First Amendment if it targets speech based on communicative content—that is, if it applies to particular speech because of the topic discussed or the idea or message expressed." *City of Austin v. Reagan Nat. Advert. of Austin, LLC*, 596 U.S. 61, 69 (2022) (quotation marks and brackets omitted). Content based restrictions are subject to strict scrutiny and must further a compelling governmental interest and be narrowly tailored to achieve that interest to survive constitutional challenge. *Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 171 (2015).

A regulation is content neutral if it is "agnostic as to content." *City of Austin*, 596 U.S. at 69. "[R]estrictions on speech may require some evaluation of the speech and nonetheless remain content neutral," so long as they do not "discriminate based on the topic discussed or the idea or message expressed." *Id.* at 72–74 (quotation marks omitted). Content neutral restrictions are subject to the less onerous standard of intermediate scrutiny and must be narrowly tailored to serve a significant governmental interest to survive constitutional challenge. *Id.* at 76. Accordingly, the Ninth Circuit has held "[t]ime, place, or manner restrictions are reasonable if they are (1) justified without reference to the content of the regulated speech; (2) narrowly tailored to serve a significant governmental interest; and (3) leave open ample alternative channels for communication of the information." *Real v. City of Long Beach*, 852 F.3d 929, 936 (9th Cir. 2017) (quotation marks and brackets omitted).

"A reasonable time, place, and manner restriction for a traditional public forum can include permitting requirements." *Kaahumanu v. Hawaii*, 682 F.3d 789, 803 (9th

Cir. 2012) (quotation marks omitted).  However, "[s]uch a scheme may not delegate overly broad licensing discretion to a government official."  *Id.* (quotation marks omitted).  "[A] permitting scheme is not 'content neutral' if it vests unbridled discretion in a permitting official."  *Epona, LLC v. County of Ventura*, 876 F.3d 1214, 1225 (9th Cir. 2017) (citations omitted).  "While permitting guidelines need not eliminate all official discretion, they must be sufficiently specific and objective so as to effectively place some limits on the authority of City officials to deny a permit." *Id.* at 1222 (citations and quotation marks omitted).  "A law subjecting the exercise of First Amendment freedoms to the prior restraint of a license, without narrow, objective, and definite standards to guide the licensing authority, is unconstitutional." *Id.* (brackets and quotation marks omitted).[2]

As pleaded here, the Amended Billboard Plan and Round 2 submission process require applications for new off-site signs to be evaluated based on broad, subjective and indefinite criteria including whether the designs proposed are "exceptional," "create a unique opportunity for the display and experience of public art," "add value to the public realm, the experience of place and the experience along Sunset Blvd," and "create valuable signage that reinforces Sunset as the premier destination for creative advertising."  *See* Submission Guide at 11.  These evaluation criteria vest unbridled discretion on the members of the Screening Committee to deny applications and are insufficiently narrow, specific, and objective to survive constitutional review. *See Spirit of Aloha Temp. v. County of Maui*, 49 F.4th 1180, 1191 (9th Cir. 2022) (collecting cases and noting "a sign ordinance that required signs to have no 'harmful effect upon the [city's] health or welfare' and no damage to the 'aesthetic quality' of

---

[2] The City cites cases including *Hunt v. City of Los Angeles*, 638 F.3d 703, 718 n. 7 (9th Cir. 2011), to argue "[i]t is an open question whether the prior restraint doctrine even applies to commercial speech."  Mot. at 23.  The Ninth Circuit cases cited predate *Epona* and *Kaahumanu*, which applied the prior restraint doctrine to commercial activities that implicate the First Amendment.  The City, thus, fails to establish the doctrine is inapplicable here.

neighboring areas was too 'ambiguous and subjective' and placed 'no limits' on official discretion" (citing *Desert Outdoor Advert. v. City of Moreno Valley*, 103 F.3d 814, 818–19 (9th Cir. 1996))).

The unbridled nature of the discretion and decision-making authority the City vested in the Screening Committee is demonstrated by the first criterion alone, which the Submission Guide explains as follows:

IS THE DESIGN EXCEPTIONAL?

Innovative media formatting integrated with excellent building design

- Size, proportion, display materials/methods differentiates from standard billboard formats and display methods.

- Is there a consistency of style, a cohesive approach between the proposed sign and development?  This includes: vertical orientation, curved or multi-planar surfaces, and/or non-standard proportions to which create an original and imaginative sign.

- Creatively uses the latest in technology to ensure digital image quality.

- Durable, functional, beautiful, harmonious with context.

Timeless design approach that contributes to the iconic nature of Sunset Blvd

- Simple, durable, classic proportions, minimal, relatively unadorned.

Quality of design approach for the billboard, building architecture, public spaces

- Such as architectural lighting elements, green walls, or other innovative design features.  Especially those that complement, integrate, or operate with any proposed off-site signage and public art.

Responds to topography and curves of the street

- Aligns to curves and topography creating focal points, visual surprise and interest.

Quality & cohesion of creative features, signage, and architecture integration

- How well do the features integrate into the overall project?
- Is there a cohesive design approach through materials, style, colors, lighting, texture, and other features?

*Id.* at 14 (errors in original).

Most if not all of the elements of this explanation (such as whether the design is "innovative," "excellent," "beautiful," "harmonious with context," "[c]reatively uses the latest in technology," or reflects a "[t]imeless design approach that contributes to the iconic nature of Sunset Blvd") are so vague, indefinite, and subjective as to vest unbridled discretion on the individual evaluators. These statements and questions do not give either applicants or evaluators a clear idea of what would merit a full score of 50 points for a design, rather than 25 points or 0.

It is also unclear whether each of these five sub-criteria must be evaluated separately and the weight each should receive, or whether evaluators simply assign a single point value for this criterion while keeping all these disparate statements and questions in mind. Accordingly, it is impossible for a court to review the score given by an evaluator and decide objectively whether he or she applied the design principles stated in the Amended Billboard Plan correctly to grant or deny a concept award. Given that this criterion is worth 50 points, an average score of less than 25 on this criterion alone would be sufficient to bring the total score below the 225-point threshold for a concept award, rendering the applicant ineligible to apply for a development agreement or obtain a permit to erect the proposed sign. *See* Submission Guide at 9. The other criteria are no better.

This issue is also demonstrated by the scores Plaintiff allegedly received on one of its submitted applications: 230, 211, 191, 188, 168, and 95. FAC ¶ 56 (organized from highest to lowest score). It is unclear why the highest scoring evaluator believed the application merited a 230 (92%)—which reflects a determination that the design was "one of the highest top-scoring projects within the designated submission

11

category" (*see* Submission Guide at 9)—while another evaluator believed it merited only a 95 (38%). Tellingly, the single score of 95 alone would have been sufficient to bring the average score for the application below the 225-point threshold for a concept award, even if all five other evaluators gave the application perfect scores.

The subjective nature of these criteria and unbridled nature of the discretion granted are compounded by the fact that the applications are evaluated and compete against other applications for a limited number of concept awards—requiring the Screening Committee to decide not only whether an application meets these criteria but whether it does so better or worse than other applications. It is also unclear who selected these criteria and related explanations, determined the weight each should receive, or decided the threshold score to secure a concept award. To the extent these actions were taken by the City Manager or Screening Committee rather than through an ordinance enacted by the City, this would further demonstrate the City delegated overly broad and unbridled discretion and decision-making authority to the City Manager and Screening Committee.

The City contends the Amended Billboard Plan and Round 2 screening process provide "adequate standards to guide" discretion and "cabins discretion far more than the Supreme Court and Ninth Circuit have required in other cases." Mot. at 25 (citing *Outdoor Media Grp. v. City of Beaumont*, 506 F.3d 895, 904 (9th Cir. 2007) & *G.K. Ltd. Travel v. City of Lake Oswego*, 436 F.3d 1064, 1083 (9th Cir. 2006)). The court disagrees. Unlike in the cases cited, the Amended Billboard Plan and Round 2 screening process do not establish clear standards to cabin the licensing official's discretion to grant or deny applications based on specific objective and measurable criteria established by ordinance. *Cf. City of Beaumont*, 506 F.3d at 904–05 (finding a regulation constitutional where the ordinance "delineate[d] fairly specific criteria regarding the relationship between the sign and the site" and the licensing official's "discretion [was] not unlimited, but cabined by specific findings regarding the relationship of the sign to the site, the freeway, and other signs in the area"); *City of*

*Lake Oswego*, 436 F.3d at 1083 (finding a regulation constitutional where "[t]he City [could] deny permits only when the sign [did] not comport with the Code's reasonably specific size and type criteria or [was] not compatible with the surrounding environment" based on "a limited and objective set of criteria" explicitly established by the ordinance, "namely 'form, proportion, scale, color, materials, surface treatment, overall sign size and the size and style of lettering'").

In sum, the court finds the Amended Billboard Plan and Round 2 submission process unconstitutionally delegate overly broad and unbridled discretion and decision-making authority to the City Manager and Screening Committee, as pleaded in the FAC. The court, therefore, DENIES in part the City's Motion as to the first and second causes of action. Having found Plaintiff has alleged sufficient facts to plead the Amended Billboard Plan and Round 2 submission process violated the First Amendment on this basis, the court need not address the parties' remaining arguments regarding these claims.

### C. Plaintiff's Third, Fourth, and Fifth Causes of Action for Violation of Due Process

Plaintiff's third, fourth, and fifth causes of action allege the City denied Plaintiff due process by creating a sham application process designed to benefit specific candidates favored by the City. FAC ¶¶ 75–76, 86, 95. The City moves to dismiss these causes of action on the grounds that Plaintiff has not and cannot plead a valid property interest that the Constitution protects. Mot. at 28.

"The requirements of procedural due process apply only to the deprivation of interests encompassed by the Fourteenth Amendment's protection of liberty and property." *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 570 (1972). "Property interests … are not created by the Constitution." *Id.* at 577. "Rather, they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law…." *Id.* "California has recognized a protected property interest in billboard construction only '[o]nce a permit has been issued.'"

1    *City of Beaumont*, 506 F.3d at 903.  As it is undisputed Plaintiff did not obtain

2    billboard permits during the Round 2 screening process, the City argues Plaintiff lacks

3    a vested property right sufficient to assert due process claims.  Mot. at 28–29

4          With respect to the third cause of action, Plaintiff contends it has adequately

5    pleaded a property interest in the non-refundable application fee of $10,362 it was

6    required to pay the City for each Round 2 application.  Opp'n at 24.  Plaintiff cites

7    *MKay, Inc. v. City of Huntington Park*, Case No. 2:17-cv-01467-SJO (AFMx), 2017

8    U.S. Dist. LEXIS 230049, at *34–36 (C.D. Cal. July 14, 2017)), to argue that

9    allegations the government took possession of money through a fraudulent and corrupt

10   process are sufficient to support a due process claim, because money constitutes a

11   protected property interest.  Opp'n at 24–26.  Plaintiff, however, did not pray for

12   damages against the City and requested only injunctive relief against this Defendant.

13   *See* FAC ¶¶ 74–84, Prayer ¶¶ 1–4.  Plaintiff does not cite any legal authority to

14   establish that an applicant's property interest in an application fee (*i.e.*, money) is

15   sufficient to support a due process claim regarding the alleged deprivation of a

16   separate, unvested property right (*i.e.*, the denial of a permit).  The court, therefore,

17   finds Plaintiff fails to state a valid due process claim on this basis.

18         With respect to the fourth and fifth causes of action, Plaintiff contends it has

19   adequately pleaded it was constructively debarred from applying for and obtaining

20   billboard sites on the Sunset Strip.  Opp'n at 24–25.  Plaintiff cites cases including

21   *Mitchell Engineering v. City and County of San Francisco*, Case No. 3:08-cv-04022-

22   SI, 2011 U.S. Dist. LEXIS 165979, at *10 (N.D. Cal. Feb. 14, 2011), to argue

23   "[d]ebarment from eligibility to bid on public contracts implicates a liberty interest

24   protected by the Due Process Clause."  Opp'n at 25.

25         Debarment is a sanction that excludes an individual or entity from doing

26   business with the government for a defined period, usually a number of years.  *Golden*

27   *Day Sch. v. State Dep't of Educ.*, 83 Cal. App. 4th 695, 703 (2000).  "[G]overnment

28   debarment of a contractor, at least one that has an established record of doing business

14

with the government, implicates a liberty interest." *Id.* at 707.  However, "[i]t is the right to be considered for, not to receive, a government contract," as "broadly speaking, … no citizen has a 'right,' in the sense of a legal right, to do business with the government." *Id.* at 705–06 (citing *Gonzalez v. Freeman*, 334 F.2d 570, 574 (D.C. Cir. 1964)).  "[A] government action that potentially constrains future business opportunities must involve a tangible change in status to be actionable under the due process clause." *Kartseva v. Dep't of State*, 37 F.3d 1524, 1527 (D.C. Cir. 1994).  A simple denial or nonrenewal of a government contract is insufficient to constitute debarment. *Golden Day*, 83 Cal. App. 4th at 705–06.

Courts have concluded there are two ways in which government action may result in a change of status sufficient to implicate a liberty interest. *Id.* at 707 (citing *Taylor v. Resolution Tr. Corp.*, 56 F.3d 1497, 1506 (D.C. Cir. 1995)).  "One is by action that formally or automatically excludes the plaintiff from work on a category of future public contracts or government employment opportunities." *Id.*  "The other is by action that precludes the plaintiff from so broad a spectrum of opportunities that it interferes with the right to follow a chosen profession or trade." *Id.*  Plaintiff has not pleaded sufficient facts to establish that either situation applies here. *See* FAC.  While Plaintiff contends the City's denial of concept awards renders it "ineligible to apply for a development agreement with the City for a new offsite sign on the Sunset Strip until the City opens the next round of submissions" (*id.* ¶ 60), Plaintiff does not plead facts to establish it has formally been or will automatically be excluded from consideration in the future.  Plaintiff's allegations that the City and Screening Committee favor Orange Barrel over other applicants (*id.* ¶¶ 43–53), is insufficient to establish that *Plaintiff* has suffered a tangible change of status sufficient to constitute debarment.  Plaintiff, thus, fails to establish it has a protectable liberty interest due to constructive debarment.

In sum, the court finds Plaintiff has failed to plead sufficient facts to support the third, fourth, and fifth causes of action for violation of procedural due process and

GRANTS in part the Motion as to these claims.

## **CONCLUSION**

For the aforementioned reasons, the court GRANTS in part the Motion and DISMISSES the third, fourth, and fifth causes of action with 21 days' leave to amend. The Motion is otherwise DENIED.


IT IS SO ORDERED.


Dated: July 8, 2024

FERNANDO L. AENLLE-ROCHA
United States District Judge